In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-24-00007-CV**

**IN RE BILL CLARK PEST CONTROL, INC. AND
LUKE TAYLOR LEACH**

**Original Proceeding
172nd District Court of Jefferson County, Texas
Trial Cause No. E-208241**

**MEMORANDUM OPINION**

In a suit for personal injuries arising out of a motor vehicle accident, the trial court denied the Defendants' motion to compel a physical and mental examination of the Plaintiff. Relators Bill Clark Pest Control, Inc. ("Bill Clark") and Luke Taylor Leach ("Leach") (collectively "Relators" or "Defendants") petitioned for a writ of mandamus to compel the trial court to withdraw its order and grant the motion. We obtained a response from the real party in interest, April Land ("Plaintiff" or "Land"). We conditionally grant mandamus relief.

1

Land allegedly sustained physical injuries in the collision that is the subject of her lawsuit. Land alleged Leach was acting in the course and scope of his employment with Bill Clark when he failed to control the speed of his vehicle and struck Land's vehicle from the rear, and that Leach's negligent driving was the proximate cause of her injuries. Land's alleged damages include past and future medical expenses, past and future mental anguish and physical pain, past and future physical impairment, lost wages, and future lost earning capacity.

The cause, nature and extent of Land's injuries is in controversy. Through her deposition testimony and reports by experts produced in discovery, Land attributed many symptoms and maladies from which she currently suffers to the injuries she sustained in the collision. These include worsening pre-existing memory loss, lower back and hip pain for which she has had surgery, neck pain and headaches, numbness and tingling in her arms and hands, nightmares, paranoia, and suicidal ideations. Land has a previous history of an automobile accident, pre-existing degenerative disc disease, peripheral neuropathy, lower back pain for which she received medical treatment, muscle pain for which she received chiropractic treatment, neck surgery, severe headaches, arthritis, use of prescription pain medication, and long-term psychiatric treatment through which she qualified for and receives Medicare and Social Security disability benefits.

Land's disclosed medical experts include Dr. Remi Nader, a physician with International Center for Neuroscience PLLC, and Dr. Edward Gripon, a forensic psychiatrist. Land disclosed that they would testify about Land's care and treatment, the extent and duration of the injury, pain, future medical expense, disability, amount of reasonable and necessary past medical expenses, causation of injury, and all other matters discussed in Land's medical records and their depositions.

A report from Dr. Nader, which is dated about four months after the collision and based upon a physical examination of the patient, noted that Land's chief complaints were headache, neck pain, and lower back pain which began after the accident. Land described her headache as throbbing in the temporal area with an intensity of 8 out of 10 occurring once or twice per week, with associated symptoms of nausea, insomnia, memory and concentration difficulties, mental fogginess, irritability, anxiety, depression, and mood changes. Land described her neck pain as radiating down her right arm with pain on a scale of 4 or 5 out of 10, aching, not constant, aggravated by looking up or down or when lifting, and including numbness and tingling in her right hand and dropping objects. Land described her lower back pain as stabbing, sharp and constant pain radiating to the knees and right hip with an intensity of 7 out of a scale of 10 and including numbness and tingling on the right side of the hip. An updated report identified Dr. Nader's recommendations for Land's future medical care related to her diagnoses from being involved in the

collision. Based upon Dr. Nader's diagnoses, a certified nurse life care planner created a life care plan that estimated that Land would incur future medical expenses in a range between $1.3 million dollars and $2.4 million dollars. The life care plan was based upon diagnoses of post-concussion syndrome, post-traumatic headache, unspecified and not intractable, cervical disc displacement with radiculopathy, cervicalgia, lumbar intervertebral disc displacement with radiculopathy with low back pain and sacroilitis, with symptoms to include, but not limited to, headaches one to two times weekly in the temporal/frontal lobe described as throbbing, associated with nausea, radiates to the neck "new needle" pain aggravated by work, and insomnia; exacerbated mental symptoms include memory difficulties, concentration difficulties, mental fogginess, as well as psychiatric symptoms of irritability, anxiety, depression, and mood changes; neck pain radiating to the right arm; and low back pain radiating to her knees and right hip; sacroiliac joint pain and antalgic gait from being involved in a motor vehicle accident on August 13, 2021.

In discovery, Land produced a report of a psychiatric evaluation by Dr. Gripon. Dr. Gripon based his report on a psychiatric evaluation including an interview and formulation of a formal mental status examination. Dr. Gripon reported that in addition to Land's previously diagnosed psychiatric disorders, given her current history, Land would also have a diagnosis of post-traumatic stress disorder. Land described her primary symptoms as depression, anxiety and fear or

4

apprehension when she had to leave home and travel in a vehicle. Dr. Gripon observed that Land was extremely apprehensive about his examination of her and that from a diagnostic standpoint she would probably benefit from neuropsychological testing.

In discovery, Relators designated as testifying experts Mark Barisa, a clinical neuropsychologist, and Dr. Christopher Ticknor, a psychiatrist. Barisa produced an expert report based upon his review of Land's medical records, which he noted lacked any neuropsychological evaluation reports or test results but contained evaluations based on interviews and subjective reporting. Barisa concluded there was no objective support for any ongoing residual physical, cognitive, emotional, or functional limitations related to a concussion or brain injury allegedly sustained in August 2021. Barisa noted Land presented a pattern of emergence and delayed reporting of symptoms that would not be consistent with the known trajectory of recovery following a mild traumatic brain injury and would instead be more consistent with the effects of chronic pain issues, chronic psychiatric illness, potential medication effects, misattribution of symptoms, psychological responses to subjective complaints, and possible exaggeration of symptoms.

Relators disclosed that Dr. Ticknor will testify about Land's mental and physical condition before and after the accident, including her "preexisting and subsequent mental and physical conditions, including any alleged post-traumatic

stress disorder and traumatic brain injury, causes of those conditions, malingering, secondary gain, drug seeking behavior, the Plaintiff's unreliability as a medical historian and the unreasonableness of any provider's relying upon facts supplied by Plaintiff in making medical conclusions for the purposes of diagnosing or treating Plaintiff or making a prognosis for her future." Relators disclosed that Dr. Ticknor is also expected to testify concerning what medical and mental health treatments, services, products, pharmaceuticals, and equipment were necessary or unnecessary for Land's mental and physical health.

Relators filed a motion to compel a physical and mental examination of Land. A supporting affidavit provided by Dr. Ticknor explained why a physical and mental examination was necessary:

> I have been asked to review the medical and forensic records of Ms. April Land in this case. Plaintiff's providers and experts have had the opportunity to examine Ms. Land in person in order to supplement their reports. I have not had that opportunity and an examination would provide me with information that is not available to me solely from a review of the medical records, depositions, and discovery responses I have been provided. Moreover, it does not appear from the documents I have been provided that the plaintiff has been properly examined by a psychiatrist or neuropsychologist for the purposes of evaluating her for potential traumatic brain injuries, post-concussion syndrome, mood disorders, PTSD, Somatization or Factitious disorders and any causal relationship between those conditions and the accident upon which she sues. I respectfully request the same opportunity to evaluate Ms. Land in person and perform a medical and psychiatric examination in order to supplement my opinions on this matter. If I am denied the opportunity to conduct the examination described herein, I will be placed at a distinct disadvantage because it will allow the plaintiff's

6

lawyer to call into question my credibility and the reliability of my opinions and conclusions.

To properly conduct my evaluation and formulate my opinions and conclusions, I request and recommend that an experienced, licensed Clinical Neuropsychologist, Dr. Mark Barisa, participate in administering validated neuropsychological tests that assess neuropsychological factors, personality traits, and possible psychopathology. The intent of these tests is to provide information to me to assist in making an assessment of Ms. Land's neuropsychological and cognitive functioning, emotional/interpersonal state, and provide additional veracity to my findings.

The requested examination would begin with a diagnostic interview and mental status examination conducted jointly with Dr. Barisa. If necessary, I may request that Ms. Land perform various paper and pencil tests as well. The initial portion of the requested examination will last no more than 2 to 2 ½ hours. The examination will not be invasive nor will it include any diagnostic laboratory tests or a physical examination. Ms. Land will not be required to disrobe during the requested examination, nor will blood be drawn or x-rays taken.

In addition to the requested time mentioned above, neuropsychological testing administered by Dr. Barisa will assist me in conducting an appropriate and medically sound examination of April Land. The administering of these tests by Dr. Barisa as part of an overall medical and psychiatric examination of Ms. Land would require an additional 5 or 6 hours to conduct. The entire evaluation will likely comprise about 7 or 8 hours and can be completed in one day. Only the interview portion of the examination may be audio recorded but cannot be video recorded. Time breaks will be provided to accommodate any of Ms. Land's needs. She may bring lunch with her or lunch can be provided.

I respectfully request the opportunity to conduct my own evaluation of Ms. Land with Dr. Barisa and perform the testing outlined in this affidavit.

In response, Land argued there was no need for an independent medical examination because she had already undergone the type of examination requested by the Defendants. She argued Dr. Ticknor would merely provide another interview when her retained expert, Dr. Gripon, had already interviewed the Plaintiff. According to Land, the Defendants possessed sufficient support for their argument that her injuries pre-existed the collision without an additional interview. Land argued the examination would burden her because she is fearful of mental health professionals.

In reply, Relators argued they were not requesting a repeat of Dr. Gripon's interview, but they sought to administer specifically enumerated tests that Dr. Gripon did not administer.

The trial court held a hearing on the motion for a physical and mental examination. Land's attorney said Land would waive her traumatic brain injury claim and her claim of post-concussion syndrome. Yet Land's attorney did not waive Land's claim that Land is still suffering from physical complaints and has mental anguish that she will continue to have in the future if not indefinitely, nor did he waive Land's right to call the expert witnesses, including the life care planner, that were designated to testify in Land's case. Defense counsel responded that they needed to examine the source and onset and etiology of all her numerous complaints and emotional, mental, and physical symptoms. Defense counsel explained that the

8

tests they were seeking to perform are designed to test neuropsychological factors and personality traits to determine whether Land's conditions and symptoms were actually caused by the accident or are caused by her delusional thinking. Defense counsel argued that Land's experts had relied on what she says her condition is but due to her mental condition Land could not provide an accurate medical history. Noting the defense could present their defense using Land's significant history, the trial court denied the motion for an independent medical examination.

"Mandamus is an extraordinary remedy granted only when the relator shows that the trial court abused its discretion and that no adequate appellate remedy exists." *In re H.E.B. Grocery Co., L.P.*, 492 S.W.3d 300, 302 (Tex. 2016) (orig. proceeding). A trial court abuses its discretion when its ruling amounts to a clear and prejudicial error of law, or if the trial court fails to correctly analyze or apply the law to the facts. *Id*. at 302-03. "The relator must establish that the trial court could have reasonably reached only one conclusion." *Id*. at 303.

Texas Rule of Civil Procedure 204.1 governs requests for the physical or mental examination of another party. *See* Tex. R. Civ. P. 204.1. The trial court may order a party to submit to a physical or mental examination by a qualified physician or to a mental examination by a qualified psychologist "only for good cause" when the physical or mental condition of a party is in controversy or the party responding to the motion has designated a psychologist as a testifying expert. *See* Tex. R. Civ.

9

P. 204.1(c). The good-cause requirement of Rule 204.1 balances the movant's right to a fair trial and the opposing party's right to privacy. *H.E.B. Grocery*, 492 S.W.3d at 303. To satisfy the good cause requirement, the movant must (1) show that the requested examination is relevant to issues in controversy and will produce or likely lead to relevant evidence, (2) establish a reasonable nexus between the requested examination and the condition in controversy, and (3) demonstrate that the desired information cannot be obtained by less intrusive means. *Id*.

"When the existence, extent, and cause of an injury are in controversy, an exam intended to glean information regarding those issues will satisfy the relevance requirement." *In re Auburn Creek Ltd. P'ship*, 655 S.W.3d 837, 841-42 (Tex. 2022) (orig. proceeding). Here, Land attributed many symptoms and maladies to the injuries she says she sustained in the collision. Dr. Ticknor explained that the validated neuropsychological tests that Dr. Barisa would participate in administering are designed to assess neuropsychological factors, personality traits, and possible psychopathy and would assist Dr. Ticknor in assessing Land's neuropsychological and cognitive functioning, assist in evaluating her for potential Somatization and Factitious disorders, and to determine any causal relationship between Land's conditions and symptoms and the accident. We conclude Relators established the relevance of the requested diagnostic interview and mental status examination to be conducted jointly by Drs. Ticknor and Barisa.

10

To establish a reasonable nexus between the requested examination and the condition in controversy, there must be evidence that the requested examination be related directly to the examination in question. *Id.* at 842. Again, Dr. Ticknor's affidavit explains that the psychiatric evaluation and neuropsychological testing are designed to determine the cause of Land's symptoms and conditions and whether they are caused by pre-existing conditions and not by the collision. We conclude Relators established a reasonable nexus between the requested examination and Land's alleged injuries.

Regarding whether the information sought by Relators could be obtained by less intrusive means, Land argues the requested examinations would merely subject Land to examinations she has already been through. Repeating an examination would be equally intrusive, not more intrusive. That said, Dr. Ticknor explained that they lacked previous neuropsychological testing to evaluate, and Dr. Gripon observed that from a diagnostic standpoint Land would probably benefit from neuropsychological testing. Further, requiring Dr. Ticknor to rely on Dr. Gripon's interview with Land forces the Defendants' expert to evaluate Land's condition through the lens of her expert, not independently. Drs. Ticknor and Barisa explained that given Land's pre-existing mental disorders, relying on an interview based on Land's patient history is problematic without evaluating the reliability of her ability

to accurately report her medical history. We conclude Relators established that the desired information could not be obtained through less intrusive means.

Relators established good cause for the trial court to grant their motion for an examination under Rule 204.1. *See* Tex. R. Civ. P. 204.1. By denying the motion, the trial court abused its discretion. "Notwithstanding that abuse of discretion, we will not grant mandamus relief if there is a clear and adequate remedy at law, such as a normal appeal." *H.E.B. Grocery*, 492 S.W.3d at 304 (internal quotation marks omitted). "The adequacy of an appellate remedy is determined by balancing the benefits and detriments of mandamus." *Id*.

"[A] denial of discovery going to the heart of a party's case may render the appellate remedy inadequate." *Walker v. Packer*, 827 S.W.2d 833, 843 (Tex. 1992) (orig. proceeding). If the trial court's order denying the examination stands, Relators' experts will be at a distinct disadvantage at trial because they have not had the opportunity that Land's experts have had to examine the Plaintiff. The trial court's ruling restricts the defense experts to the evidence developed by the Plaintiff's experts and deprives the defense experts of the opportunity to discover facts that may contradict the opinions of the Plaintiff's experts. *See In re Charney*, No. 09-21-00028-CV, 2021 WL 2371251, at *3 (Tex. App.—Beaumont June 10, 2021, orig. proceeding) (mem. op). By denying the Rule 204.1 motion, the trial court

precluded Relators from obtaining the information that would be required to evaluate harm on appellate review. *Id.*

We conclude that an examination by the defense experts is required to obtain a fair trial and therefore necessitates the intrusion upon Land's privacy. A fair resolution of the cause, nature, and extent of Land's injuries depends upon competing expert testimony that the trial court has prevented Bill Clark and Leach from developing. *See Auburn Creek*, 655 S.W.3d at 843. Because the trial court's erroneous ruling severely compromises the ability to present a viable defense, Bill Clark and Leach lack an adequate remedy by appeal. *Id*.

We hold that the trial court abused its discretion in denying the motion for a physical and mental examination and that Bill Clark and Leach lack an adequate appellate remedy. Accordingly, we conditionally grant the petition for writ of mandamus. We are confident that the trial court will vacate its order denying the motion to compel a physical and mental examination of Plaintiff and issue an order under Rule 204.1(d) that requires April Land to submit to a physical and mental examination by the Defendants' experts. The writ will issue only if the trial court does not comply.

PETITION CONDITIONALLY GRANTED.

PER CURIAM

Submitted on January 18, 2024
Opinion Delivered May 9, 2024

Before Golemon, C.J., Horton and Wright, JJ.